UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA ex rel.
PARTNERS FOR COMPLIANCE
ASSOCIATES,

                Plaintiff,

- against –

ERIE COUNTY MEDICAL
CENTER CORPORATION and
WILLCARE, INC.,

                Defendants.
-----------------------------------------------------------x

**IN CAMERA AND UNDER SEAL**

**COMPLAINT**

07 Civ. _____

07 CV 0644

**JURY TRIAL DEMANDED**

FILED 2007 SEP 28 PM 1:38 US DISTRICT COURT WDNY - BUFFALO

        Plaintiff the United States of America ex rel. Partners for Compliance Associates ("PCA"), by its undersigned attorneys, alleges for its Complaint herein as follows.

**PRELIMINARY STATEMENT**

        This action is filed by Relator Partners for Compliance Associates ("Relator") pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. (the "FCA" or the "Act"), to recover damages and civil penalties on behalf of the United States arising from false statements and claims made in violation of the Act by defendants Erie County Medical Center Corporation ("ECMC"), a regional academic hospital system located in Western New York, and Willcare, Inc. ("Willcare"), a home health care agency. Defendants have participated in a scheme to defraud Medicare and Medicaid since at least January 1, 2004 involving illegal kickbacks, giving rise to violations of the FCA.

-1-

## JURISDICTION AND VENUE

1. PCA brings this action under the False Claims Act pursuant to 31 U.S.C. § 3730 (b)(1) and 42 U.S.C. § 1320a-7b(b).

2. This Court has jurisdiction over this action pursuant to 28 U.S.C §§ 1331 and 1345.

3. Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1391(b) and 1391(c) because a substantial part of the acts complained of herein occurred in this district, including without limitation, acts proscribed by 31 U.S.C. § 3729.

## THE PARTIES

4. PCA is a Delaware general partnership, which pursuant to Section 15-201(a) of the Delaware Revised Uniform Partnership Act, is not an entity distinct from its partners.

5. Defendant ECMC is a New York public benefit corporation with its main offices located at 462 Grider Street, Buffalo, New York. ECMC operates an academic medical center with 550 inpatient beds and 136 skilled nursing home beds, on- and off-campus health centers, over 40 outpatient specialty care clinics, and the Erie County Home, a 586-bed skilled nursing facility.

6. Defendant Willcare is a New York corporation with its principal place of business at 346 Delaware Avenue, Buffalo New York. Willcare is a Medicare-certified home health care and supplemental staffing agency, serving patients in New York and Ohio. Willcare bills Medicare and Medicaid for services it provides which are covered by Medicare and Medicaid.

## FACTS

### I. BACKGROUND

7. The United States, through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare program for the aged and disabled, established by Title XVIII of the Social Security Act. See 42 U.S.C. §§ 1395 et seq.

8. Under the Medicare program, CMS makes payments to hospitals for inpatient and outpatient services after the services are rendered. CMS enters into provider agreements with hospitals that govern the hospital's participation in the Medicare and Medicaid programs.

9. Under the Medicare program, services provided to patients are reimbursed according to two different methods.

10. As a prerequisite to payment by Medicare, CMS requires hospitals to submit a Medicare cost report annually at the conclusion of the hospital's fiscal year. The cost report is the final claim that a hospital files with Medicare's fiscal intermediary identifying the hospital's costs for services rendered to Medicare beneficiaries and stating the amount of reimbursement the hospital believes to be due for the year. See 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. See also 42 C.F.R. § 405.1081(b)(1). Similar provisions pertain to New York State's Medicaid program.

11. Medicare relies upon the cost report to determine whether the hospital is entitled to reimbursement beyond the interim payments that the hospital has received from Medicare during the course of the year, or whether the hospital was overpaid by Medicare, and consequently, must reimburse Medicare for the excess amounts paid under the program during the course of the year. See 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

NEWYORK01 1209049v1 042456-000001

12. Every Medicare cost report contains a Certification, which must be signed by the chief administrator of the hospital or a responsible designee of the administrator.

13. The hospital must certify that the Medicare cost report: (1) is truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) is correct, *i.e.*, that the hospital is entitled to reimbursement for the reported costs; (3) is complete, *i.e.*, that the cost report is based upon all cost information known to the hospital; and (4) that the services identified in the cost report are billed in compliance with the law.

14. The hospital has the legal obligation to disclose to Medicare through its fiscal intermediary all known errors and omissions in its claims for Medicare reimbursement, including those costs identified in its cost reports.

15. At all times relevant hereto, ECMC was required to—and did—submit its annual Medicare cost reports to the government.

16. At all times relevant hereto, ECMC was required to—and did—certify its annual Medicare cost reports.

17. At all times relevant hereto ECMC was required to submit annual Medicaid cost reports to the New York State Department of Health.

18. At all times relevant hereto, ECMC was required to—and did—certify its annual Medicaid cost reports.

19. Under the Medicare program, the United States pays for certain home health care services rendered to beneficiaries who meet certain requirements. 42 U.S.C. §§ 1395d(a)(3), 1395k(a)(2)(A). Services covered under this benefit include part-time or intermittent skilled nursing care, speech-language pathology, physical and occupational therapy,

NEWYORK01 1209049v1 042456-000001

part-time or intermittent home health aide services, and medical social services, 42 U.S.C. § 1395x(m).

20. A physician must certify a patient's need for home health services for the services to be reimbursable by Medicare and/or Medicaid. 42 U.S.C. § 1395f(a)(2)(C); 42 C.F.R. § 424.22. Home health services are only covered if they are included in a plan of care established by a physician and reviewed and signed by that physician at least every 60 days. See 42 C.F.R. §§ 409.41(b), 409.42, 409.43.

21. Medicare does not contract in advance with home health agencies to provide particular services for particular patients but instead reimburses home health agencies for services provided. Any benefits derived from the services of a home health agency to a patient are derived by the patient and not by the Medicare program or the United States. However, Medicare enters into provider agreements with home health agencies in order to establish their eligibility to participate in the Medicare program. One condition for a home health agency's participation in the Medicare program is that it comply with Federal laws and regulations. See 42 C.F.R. § 484.12(a).

22. Effective October 1, 2000, the Medicare program began using a prospective payment system (PPS) for reimbursing home health agencies, including Willcare, for home health services. Under the PPS system, Medicare payment is no longer based on the home health agency's reasonable costs, but is instead based on a standardized payment amount adjusted to reflect the patient's condition and care needs.

23. Under PPS in order to be paid and to retain their payments, home health agencies must submit Form UB-92s or the electronic equivalent, pursuant to an Electronic Data Interchange Enrollment Form, and they still must submit year-end cost reports. Providers submit

NEWYORK01 1209049v1 042456-000001

UB-92s or the electronic equivalent at the beginning of the 60-day period for which a physician has certified home health care for a beneficiary. Home health agencies may receive part of the reimbursement for the care of the patient then and the remainder (subject to revisions to the amount) at the close of the 60-day period after they submit a second UB-92 or its electronic equivalent. Providers then must submit a cost report to the Medicare program at the end of their fiscal year. See generally, 42 C.F.R. §§ 484.200 et seq., 405.1801(b)(l), 413.1 et seq.

24.     At all times relevant to this action, including when it submitted year-end cost reports, Willcare as a Medicare provider, had a standing obligation to disclose matters affecting its initial or continued right to Medicare payments and were prohibited from concealing such matters in order to retain payments to which it was not entitled. Specifically, 42 U.S.C. § 1320a-7b(a)(3) provides:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

25.     Throughout the time period relevant to this action, Willcare was required to and did submit claims and year-end cost reports in order to obtain and retain Medicare payment under the PPS system, as described above.

26.     Willcare expressly agreed on its Electronic Data Interchange Enrollment Forms "[t]hat it will submit claims that are accurate, complete, and truthful," and acknowledged that "the submission of . . . claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or

NEWYORK01 1209049v1 042456-000001

other information relating to that claim that is required pursuant to this Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."

27. Willcare's annual year cost reports for the years 2004 to date each contained the following certification acknowledging the illegality of procuring patient referrals through kickbacks or other unlawful means and attesting that the services identified in the cost reports complied with healthcare laws:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine, and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and Administrative action, fines, and/or imprisonment may result.

28. Willcare, in order to obtain and retain its Medicare reimbursements, was thus required to certify, and officers of Willcare did actually certify on Willcare's behalf, for each year from 2004 to date that they knew that procuring Medicare referrals through the payment directly or indirectly of kickbacks was illegal and that Willcare's cost reports were; (1) truthful *i.e.*, that the cost information contained in the report was true and accurate; (2) correct, *i.e.*, that Willcare was entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, *i.e.*, that the cost report was based upon all information known to Willcare; and (4) that the service, identified in the cost report were billed in compliance with the laws governing healthcare services (including laws such as AKS that prohibit procuring patient referrals though kickbacks).

29. At all times relevant hereto Willcare was required to submit annual Medicaid cost reports to the New York State Department of Health.

NEWYORK01 1209049v1 042456-000001

30. At all times relevant hereto, Willcare was required to—and did—certify its annual Medicaid cost reports.

I.   II.   **DEFENDANTS' KICKBACK SCHEME**

31. The Federal health care Anti-Kickback Statute, 42 U.S.C.§1320a-7b(b) (the "Anti-Kickback Statute" or "AKS"), prohibits any person or entity from making or accepting "remuneration" to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally funded health care program.

32. Under the Anti-Kickback Statute, a hospital may not offer or pay any remuneration, in cash or kind, directly or indirectly, to a home health care agency in exchange for referrals from the hospital for Medicare and Medicaid patients.

33. Prior to 2003, ECMC had a preferred provider agreement with Staff Builders, Inc., a home health care agency.

34. In 2003, Willcare contracted with ECMC to provide home health care services to all ECMC patients, regardless of their ability to pay, who do not express a preference to be served by a specific home care provider.

35. ECMC sought the arrangement with Willcare to reduce its occupancy rate, so that it would achieve a significant savings in operating costs. Due to the exclusivity arrangement, ECMC was able to save up to $4.4 million annually because it could now automatically discharge indigent patients much earlier, rather than having those patients remain admitted for long periods at ECMC.

36. Willcare now had access to a substantial volume of new patients for whom it provided home health care services for which Willcare, in turn, billed Medicare and Medicaid.

NEWYORK01 1209049v1 042456-000001

37. This contractual relationship was renewed in early 2007, after ECMC issued a Request For Proposal ("The First RFP") the Fall of 2006, seeking a "Certified Home Health Agency (CHHA)" to accept ECMC's indigent patients. The First RFP noted that ECMC would accept vendor proposals until December 28, 2006. The First RFP states:

> The qualified agency which enters into the proposed agreement must agree to give [ECMC] the contractual right to transfer such [indigent] patients requiring home care to the CHHA. The agency must, in turn, agree to serve the patient.

38. The First RFP also provided that:

> The selected agency would be responsible for conducting all patient billings and **would be entitled to retain all retain all revenues reimbursed by Medicare, Medicaid and all other payers for services rendered.** [emphasis added]. The selected agency would also be responsible for all costs associated with the provision of home care to patients who lack health insurance.

39. The First RFP also sets forth the particular types of services the CHHA awarded the contract will be expected to provide, including for example, "Skilled Nursing," "Physical Therapy," and "Occupational Therapy" and states, "The CHHA will be obligated under its contract to provide home care services to patients regardless of their ability to pay." This provision removes any discretion on the part of the CHHA on whether to accept patients.

40. The First RFP asks the bidding CHHA various questions about their home care capabilities and notes that "Proposals will be evaluated by a panel comprised of various personnel from the Erie County Medical Center Corporation." The five weighted criteria upon which the CHHA's bid will be evaluated are listed in the First RFP and include "Company Profile/Qualifications/Experience," "Home Care Service Expectations," Quality of Care," "Information Services," and "Policymaking." The agreement which the winning CHHA is expected to sign is attached to the First RFP and incorporates the terms of the First RFP.

NEWYORK01 1209049v1 042456-000001

41.     Shortly thereafter, ECMC issued a revised RFP, which stated that vendor proposals would now be accepted until January 19, 2007 ("the Second RFP"). However, the substance of the RFP did not change. The Second RFP merely added a statement that ECMC and the selected CHHA promised to comply with AKS. The structure of the arrangement whereby the selected CHHA would become the exclusive provider of home healthcare services for indigent patients discharged from ECMC, remained unchanged.

42.     In or about, March 2007, Willcare was selected as the CHHA, per the terms of the Second RFP and signed a contract to formalize the arrangement. In fact, Willcare was to only CHHA to "bid" on the ECMC contract.

43.     Upon information and belief, the entire RFP process was contrived, so that Willcare would receive the contract guaranteeing its exclusivity.

44.     Under AKS, both the payor and the recipient of the kickback are liable. In the case of ECMC, Medicare payments and cost reports were tainted by the kickback arrangement. Government insurance payments to Willcare were dependent upon the kickback arrangement. The bills that Willcare sent to Medicare and Medicaid ("claims" under the FCA) were connected to the kickback scheme.

45.     ECMC also participated in the scheme through its cost reports. The cost reports filed each year by ECMC, all certified that none of the business covered by the cost reports was tainted by kickbacks. That certification was false.

46.     False Claims Act liability exists when a claim is submitted for payment (whether paid or not) and a knowing violation of the Anti-Kickback Statute has occurred, by the defendants causing the government to pay a claim which would not have paid had the

NEWYORK01 1209049v1 042456-000001

government been aware of the violation, or, if a payment is linked to agreement or contract, that in whole or partially, was dependent upon an illegal kickback.

47.  As with many home health agencies, a large percentage of Willcare's patients are Medicare and/or Medicaid beneficiaries, and the Medicare and Medicaid programs constitutes a significant source of revenue for Willcare. Due to Willcare's exclusive relationship with ECMC, ECMC referred large volumes of Medicare and Medicaid patients to Willcare. Willcare, in turn, submitted and caused the submission of millions of dollars in claims for payment to the Medicare program based on those referrals.

48.  These claims included UB-92s or their electronic equivalents and year-end cost reports from each year from 2004 to present. Willcare presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent. Under the FCA, 31 U.S.C. § 3729(a)(l), such claims were false and/or fraudulent because Willcare was not entitled to be paid for them. All claims that stem from an AKS contract are false claims.

49.  ECMC, in filing claims for reimbursement by Medicare and/or Medicaid, has certified, either expressly or impliedly through its participation in a Federal health care program, its compliance with the Anti-Kickback Statute.

50.  Willcare's claims to Medicare and Medicaid were made by electronic submissions which included certifications of compliance with Federal reimbursement rules and the Anti-Kickback Statute, and, moreover, in its annual cost reports to Medicare and Medicaid, certified, falsely, its compliance with AKS.

51.  PCA estimates that Willcare/ECMC kickback scheme harmed the United States and New York State by at least $16.1 million, based upon the illegally induced, kickback-

NEWYORK01 1209049v1 042456-000001

related contracts between ECMC and Willcare, from January 1, 2004 to date, that gave Willcare the power to approximately 4,600 claims to Medicare and/or Medicaid it would not have otherwise been able to submit– claims that should be voided as false because of their kickback legacy.

52. For each home health care patient, Willcare's fee is $3400 for every 60 days of home health care service provided. ECMC, as a regional rehabilitation center, whose services include conducting major orthopedic and cardiac surgeries and treating patients who require diabetes management, treats a significant number of patients who are prime candidates for home health care services. PCA estimates that Willcare receives 25 cases every week. Thus, annually, Willcare generates approximately $4.4 million in revenue based on patients referred by ECMC.

## FIRST CLAIM

### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)
### Presenting False Claims for Payment

53. PCA repeats the allegations contained in Paragraphs 1 through 52 above.

54. PCA seeks relief against the Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1).

55. As set forth above, ECMC knowingly, or acting with deliberate ignorance or with reckless disregard for the truth, presented, or caused to be presented, to an officer, employee or agent of the United States, false and fraudulent claims for payment or approval in connection with the submission of ECMC's cost reports and requests for reimbursement under the Medicare and Medicaid programs.

NEWYORK01 1209049v1 042456-000001

56. The United States, based on aforesaid cost reports, paid ECMC under the Medicare and Medicaid Programs because of the fraudulent conduct of the Defendants.

57. By reason of ECMC's false and fraudulent claims, the United States has been damaged in a substantial amount and therefore is entitled to multiple, treble damages under the Federal False Claims Act in an amount to be determined at trial, plus a civil per-claim penalty in the maximum amount permitted by law for each violation.

## SECOND CLAIM

### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)
### Presenting False Claims for Payment

58. PCA repeats the allegations contained in Paragraphs 1 through 57 above.

59. PCA seeks relief against the Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1).

60. As set forth above, Willcare knowingly, or acting with deliberate ignorance or with reckless disregard for the truth, presented, or caused to be presented, to an officer, employee or agent of the United States, false and fraudulent claims for payment or approval in connection with the submission of Willcare's cost reports and requests for reimbursement under the Medicare and Medicaid programs.

61. The United States, based on aforesaid cost reports, paid Willcare under the Medicare and Medicaid Programs because of the fraudulent conduct of the Defendants.

62. By reason of Willcare's false and fraudulent claims, the United States has been damaged in a substantial amount and therefore is entitled to multiple, treble damages under the Federal False Claims Act in an amount to be determined at trial, plus a civil per-claim penalty in the maximum amount permitted by law for each violation.

NEWYORK01 1209049v1 042456-000001

## THIRD CLAIM

### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)
### based on violations
### of the Anti-Kickback Statute 42 U.S.C.§1320a-7b(b)

63. PCA repeats the allegations contained in Paragraphs 1 through 62 above.

64. PCA seeks relief against the Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1).

65. Willcare, in filing claims for reimbursement by Medicare and/or Medicaid, has certified, either expressly or impliedly through its participation in a Federal health care program, its compliance with the Anti-Kickback Statute.

66. Willcare is liable under the False Claims Acts of the United States and the State of New York because of claims submitted for payment in knowing violation of the Anti-Kickback Statute, causing the government of the United States and the State of New York to pay a claim which would not have paid had the government been aware of the violation.

67. Payments made by the government were linked to agreements contracts, that were dependent upon the illegal kickbacks engaged in by Defendants discussed herein.

68. The United States, based on aforesaid submissions for payment which were tainted by the defendants' kickback scheme, paid Willcare under the Medicare and Medicaid Programs because of the fraudulent conduct of Willcare.

69. By reason of Willcare's false and fraudulent claims, the United States and the State of New York have been damaged in a substantial amount and therefore is entitled to multiple, treble damages under the False Claims Act in an amount of at least $16,100,000, plus a civil per-claim penalty in the maximum amount permitted by law for each violation.

NEWYORK01 1209049v1 042456-000001

## FOURTH CLAIM

### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(3) and 3732(b)
### False Claims Act Conspiracy

70. PCA repeats the allegations contained in Paragraphs 1 through 69 above.

71. This is a claim for treble damages and for forfeitures under the False Claims Act, 31 U.S.C. 54 3729 et seq., as amended.

72. Through the acts described above and otherwise, Defendants entered into one or more conspiracies to defraud the United States and the State of New York through the submission of false and fraudulent claims and through the payment received by Defendants on these false and fraudulent claims.

73. Defendants have taken substantial steps in furtherance of those conspiracies including, among other acts, preparing false cost reports and other documents and records and submitting such reports and other documents and records to the United States and the State of New York and their intermediaries for approval and payment.

74. The United States and the State of New York, and its fiscal intermediaries and/or agencies, unaware of Defendants' conspiracies or the falsity of the reports, documents and claims submitted by the Defendants and as a result thereof, have paid millions of dollars in Medicare and Medicaid reimbursements that they would not otherwise have paid.

75. Furthermore, because of the false records, statements, claims, and omissions by Defendants, the United States and its fiscal intermediaries and New York State have not recovered Medicare and Medicaid funds from ECMC that otherwise would have been recovered.

NEWYORK01 1209049v1 042456-000001

76. By reason of Defendants' conspiracies and the acts taken in furtherance thereof, the United States has been damaged in an amount to be determined at trial.

## FIFTH CLAIM

### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(3) and 3732(b)
### False Claims Act Conspiracy

77. PCA repeats the allegations contained in Paragraphs 1 through 76 above.

78. This is a claim for treble damages and for forfeitures under the False Claims Act, 31 U.S.C. 54 3729 et seq., as amended.

79. Through the acts described above and otherwise, Defendants entered into one or more conspiracies to defraud the United States through the submission of false and fraudulent claims and through the payment received by Defendants on these false and fraudulent claims.

80. Defendants have taken substantial steps in furtherance of those conspiracies including, among other acts, preparing documents generated due to Defendants' illegal kickback scheme, and submitting such reports and other documents and records to the United States and its intermediaries for approval and payment.

81. The United States and its fiscal intermediaries, unaware of Defendants' conspiracies or the falsity of the reports, documents and claims submitted by the Defendants and as a result thereof, have paid millions of dollars in Medicare and Medicaid reimbursements that they would not otherwise have paid.

82. Furthermore, because of the false records, statements, claims, and omissions by Defendants, the United States and its fiscal intermediaries and New York State

NEWYORK01 1209049v1 042456-000001

have not recovered Medicare and Medicaid funds from ECMC that otherwise would have been recovered.

83. By reason of Defendants' conspiracies and the acts taken in furtherance thereof, the United States and the State of New York have been damaged in an amount of least $16,100,000.

## SIXTH CLAIM

### Violations of the New York State False Claims Act
### New York State Finance Law § 187, et seq.
### Presenting False Claims for Payment

84. PCA repeats the allegations contained in Paragraphs 1 through 83 above.

85. PCA seeks relief against the Defendants under the New York State False Claims Act, New York State Finance Law § 187, et seq.

86. As set forth above, ECMC knowingly, or acting with deliberate ignorance or with reckless disregard for the truth, presented, or caused to be presented, to an officer, employee or agent of the United States and the State of New York, false and fraudulent claims for payment or approval in connection with the submission of ECMC's cost reports and requests for reimbursement under the Medicaid program.

87. New York State, based on aforesaid cost reports, paid ECMC under the Medicaid Program because of the fraudulent conduct of the Defendants.

88. By reason of ECMC's false and fraudulent claims, the State of New York has been damaged in a substantial amount and therefore is entitled to multiple, treble damages under the New York State False Claims Act in an amount to be determined at trial, plus a civil per-claim penalty in the maximum amount permitted by law for each violation.

## SEVENTH CLAIM

**Violations of the New York State False Claims Act**
**New York State Finance Law § 187, et seq.**
**Presenting False Claims for Payment**

89. PCA repeats the allegations contained in Paragraphs 1 through 88 above.

90. PCA seeks relief against the Defendants under the New York State False Claims Act, New York State Finance Law § 187, et seq.

91. As set forth above, Willcare knowingly, or acting with deliberate ignorance or with reckless disregard for the truth, presented, or caused to be presented, to an officer, employee or agent of the United States and the State of New York, false and fraudulent claims for payment or approval in connection with the submission of Willcare's cost reports and requests for reimbursement under the Medicaid programs.

92. The United States and the State of New York, based on aforesaid cost reports, paid Willcare under the Medicaid Programs because of the fraudulent conduct of the Defendants.

93. By reason of Willcare's false and fraudulent claims, the State of New York has been damaged in a substantial amount and therefore is entitled to multiple, treble damages under the New York State False Claims Act in an amount to be determined at trial, plus a civil per-claim penalty in the maximum amount permitted by law for each violation.

WHEREFORE, PCA requests that judgment be entered in favor of the United States and and the State of New York against Defendants as follows:

(a) On the First, Second, Third, Fourth, and Fifth Claims for Relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2)), for treble the United States' damages, in an amount to be determined at trial, plus an $11,000 penalty for each false claim presented;

(b) On the First, Second, Third, Fourth, and Fifth Claims for Relief, an award of costs pursuant to 31 U.S.C. § 3729(a);

(c) On the Sixth and Seventh Claims for Relief (Violations of the New York State False Claims Act, New York State Finance Law § 187, et seq) and (2)), for treble the State of New York's damages, in an amount to be determined at trial, plus a $12,000 penalty for each false claim presented;

(d) On the Sixth and Seventh Claims for Relief, an award of costs pursuant to New York State Finance Law § 189(3); and

(e) awarding such other and further relief as the Court may deem just and proper.

Dated: Rochester, New York
September 28, 2007

GATES & ADAMS, P.C.

By: /s/ Anthony J. Adams
Anthony J. Adams
28 East Main Street
Suite 600
Rochester, New York 14614
(585) 232-6900

TROUTMAN SANDERS LLP

Philip R. Michael
Eric L. Unis
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 704-6000

*Attorneys for the Relator*